**FILED**
September 3, 2021 10:24 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: tlb   SCANNED BY: TB 9\3\21

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* | ) | |
| PATRICIA CROWE, MD, | ) | **FILED *IN CAMERA* AND** **1:21-cv-770** |
| | ) | **UNDER SEAL** Robert J. Jonker |
| Plaintiffs, | ) | Chief U.S. District Judge |
| | ) | |
| v. | ) | |
| | ) | |
| SPARROW MEDICAL GROUP; | ) | **DO NOT PLACE ON PACER** |
| SPARROW CARE NETWORK; | ) | |
| and SPARROW HEALTH SYSTEM, | ) | |
| | ) | |
| Defendants. | ) | |

---

## *QUI TAM* COMPLAINT

---

### INTRODUCTION

1.       This is a False Claims Act ("FCA") action to recover damages and civil penalties

on behalf of the United States of America arising from false claims and/or fraudulent statements,

records and claims made by Defendants. The allegations involve fraud on the Medicare and

Medicaid programs due to upcoding, incident-to billing and provider-based payments.

2.       Defendants Sparrow Medical Group, Sparrow Care Network, and Sparrow Health

System engaged in upcoding and violations related to incident-to billing and provider-based

billing, which caused false claims for payment to be submitted to the United States.

3.   As explained in greater detail below, Defendants engaged in the above-mentioned

practices, which purposefully led to the submission of false claims which violated the FCA.

4.   The FCA provides that any person who knowingly submits or causes to

be submitted to the Government a false or fraudulent claim for payment or approval is liable for

a civil penalty of $5,500 to $11,000 for each such claim submitted on or before November 2,

2015 and $10,781 to $21,563 for each claim submitted after November 2, 2015, as well as

three times the amount of the damages sustained by the Government. The FCA permits persons

having information regarding a false or fraudulent claim against the Government to bring an

action on behalf of the Government and to share in any recovery. The complaint must be filed

under seal, without service on the defendants. The complaint remains under seal while the

Government conducts an investigation of the complaint's allegations and determines whether to

join the action.

5.   Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and

civil penalties arising from Defendants' purposeful submission of false and/or fraudulent claims

to the Government.

## PARTIES

6.   Relator Patricia Crowe, MD is the Medical Director of the Sparrow Urgent Care

/FastCare department of Sparrow Medical Group. She is also a member of the Sparrow Medical

Group. As part of her job, Relator regularly reviews medical charts and works with on-site

managers, physicians, and Advanced Practice Providers ("APPs') of the Urgent Care and

FastCare facilities. Additionally, Relator is a Sparrow Medical Group Board member and a

Sparrow Hospital Quality and Safety Committee Board member.

7.   Defendant Sparrow Medical Group ("SMG") is a key component of Defendant Sparrow

Care Network. In April 2015, SMG included more than 278 primary, specialty and hospital-

based physicians and APPs.

8.   Defendant Sparrow Care Network ("SCN") is a clinically integrated network with

employed and independent physicians. More than 600 physicians work in the SCN.

9.     Defendant Sparrow Health System ("SHS") is a non-profit which encompasses five hospitals, a health maintenance organization, home health care facilities, medical equipment services, a research institute, a foundation and one of the largest health clubs in Michigan. In 2018—the last year publicly available—SHS reported revenue of $1.3 billion, with $1 billion generated from treating patients. The non-profit made $2.3 million more than it spent from its operations, but its investments lost money. Overall, it lost $46.2 million in 2018. It had net assets of $871 million. Medicare and Medicaid make up approximately 65 percent of Sparrow Hospital's patient revenue. Medicare averages 47.5 percent and Medicaid averages 18.4 percent.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1331, 1345 and 1367.

11.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, transacted business in, and/or have committed the alleged acts in the Eastern District of Michigan.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or have transacted business in the Eastern District of Michigan.

## LEGAL BACKGROUND

### The False Claims Act

13.     The False Claims Act, 31 U.S.C. § 3729(a)(1) provides, in relevant part, that any person who:

3

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; and/or

    (C)    conspires to commit a violation of subparagraph (A) or (B);
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person. [1]

14.    The FCA permits individuals to bring civil actions in the name of the government. 31 U.S.C. § 3730(b)(1).

15.    Relator seeks to recover damages and civil penalties in the name of the United States arising from the false statements and fraudulent claims for payment made by Defendants to the Medicare program.

## The Medicare Program

16.    The Medicare program is a health insurance program administered by the United States, which is funded through taxpayer revenue. Medicare is directed by HHS, and was designed to assist participating states in providing medical services and durable medical equipment to persons over 65 and certain other persons who qualify for coverage.

## Other Federally-Funded Health Care Programs

17.    Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE.  Accordingly, those other two programs are briefly discussed as well.

18.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of

---

[1] The civil penalties assessed under the FCA were adjusted by the Federal Civil Penalties Inflation Adjustment Act, 31 U.S.C. § 3729(a)(1). The current civil penalties for violations of the FCA range from not less than $10,781.40 to not more than $21,562.80.

1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level while the individual states administer the program on the state level.  Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare.  As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

19.     TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.   Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*).  Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## ALLEGATIONS

20.     Sparrow Healthcare System ("SHS") "educates its doctors and mid-level

providers to code the highest level of service to Medicare, compiles the levels by provider, and tracks performance with "productivity" reports evaluating how they have coded and whether they are generating enough revenue to justify their paychecks.

21.     After "educating" providers in one practice, SHS concluded in 2018 that the system expected an "improvement" of $750,000, and that the coding component and resulting revenue exceeded its target at the Thoracic and Cardiovascular Institute ("TCI").

22.     Among the next steps: continue monitoring coding levels and educate providers. By the end of October 2018, TCI already exceeded the $750,000 Value Transformation improvement target by more than four-fold, sitting at $3,286,020.

23.     A second Value Transformation update pertaining to physician productivity concluded coding and documentation efforts resulted in an 0.037 wRVU per patient visit increase – the equivalent of $518,609-- from January through October 2018.

24.     Executives focused their efforts on poor performing units and providers. Their emphasis on using higher CPT codes came as they reduced the frequency of coding reviews – a topic they assessed as one of eight high-risk areas facing the health system just two years ago.

25.     Sparrow physicians and Advanced Practice Providers ("APP") now use some codes as much as 50 percent more, on average, than their colleagues in Michigan, Medicare payment data show.

26.     The differences in the level of service are supposed to be determined on the complexity of the case and the time spent – elements that reflect medical necessity. At Sparrow, they are a critical component in the compensation paid doctors and advanced practice providers (APP) such as nurse practitioners and physician assistants. Practitioners who don't hit their targets may be subject to pay cuts.

27.     Consider this comparison of the average number of services provided by Sparrow

and Michigan physicians and APPs for codes 99211 through 99215 – codes used for the evaluation and management of established patients __ from calendar



years 2015 through 2018. Data Analysis, Dashboard Tab.

28.     Code 99214 is one of the most used and abused codes in the country, according to websites directed at medical coders. On the current Medicare Physician Fee Schedule, Code 99214, for example, costs taxpayers, on average, $34.28 more than code 99213.



29.     A comparison of the use of evaluation and management CPT codes for new patients show similar results. Sparrow doctors and APPs infrequently use the least expensive evaluation code – about half as much as their peers. The



difference in cost to taxpayers between code 99203 and 99204 is $57.74. These patterns

hold true for 14 practitioners associated with specific examples provided by Dr. Patricia

Crowe albeit their use of expensive CPT codes is more extensive. This small group also used codes with lower pay rates far less frequently.

30.     Strikingly, the use of code 99214 increases as Sparrow's emphasis on reviewing proper coding wanes and its education of physicians and mid-level providers on increasing the use of higher codes grows in 2017.

31.     For the 360 providers listed on the Sparrow Health System website and working there from 2015 through 2018, Medicare payment data maintained by CMS show an increase in the average use of code 99214 and a decrease in the use of code 99213 from 2015 through 2018. Upcoding is one of three allegations raised by Dr. Patricia Crowe.

**Upcoding**

32.     Sparrow pushed for higher level service codes, which pay more to doctors and the facility, as part of its ongoing "value transformation program," an initiative the healthcare company claimed was designed to make its systems more efficient and affordable. The program focused on areas "where performance is in question," including coding and documentation. The effect, as detailed in October 2018 internal reports, was to increase revenue and productivity. Senior executives and the board of directors received regular updates.

33.     In a December 13, 2018 report to the Sparrow Medical Group Board of Directors David Kruger, the vice president of physician practice administration, explained the value transformation project focused on three areas.

34.     Kruger noted in his presentation "focus is being given to projects where performance is in question."   An October 31, 2018 weekly update titled, "Physician Productivity," and distributed to board members counted among its accomplishments:

"Coding and Doc - 2018 plan developed and implemented. Data capture issues resolved. Improved 0.037 wRVU [work Relative Value Units] per visit which is equal to a revenue improvement of $518,609 ytd [year-to-date]"

Its next steps included:

"Coding and Doc – Continue targeted clinical documentation specialist work. Continue to work with IT on revising E&M templates to facilitate the capture of data necessary for higher E&M codes."

35.     Another portion of the report explained coding and documentation efforts had been completed in the Thoracic and Cardiovascular Institute (TCI) and the results had "exceeded target of 3.05  in October YTD (3.36)."  The update added that executives would continue to monitor E&M billing levels monthly and "educate providers."

36.     The TCI Value Transformation Weekly Update notes the expected "improvement" was $750,000. It categorizes financial increase by stages: imperative, implemented and realized.

37.     A second initiative, monthly productivity reports, (2018 reports) spotlights two keys affecting provider compensation – the CPT codes and work Relative Value Units (wRVUs). Both are critical elements in the Medicare Physician Fee Schedule.

38.     The schedule is based on the principle that not all physician services represented by CPT codes are created equal. Some of these services require a considerable investment of physician time and effort, clinical staff and specialized equipment.

39.     Medicare calculates fees for each service and procedure based on a single measure, the Relative Value Unit (RVU). Each RVU compares the value of a procedure or service relative to other procedures or services.

40.     For example, CPT Code 69209, remove impacted ear wax unilateral, is assigned

9

0.40 total RVUs while cleaning out a mastoid cavity, CPT Code 69220, is awarded 2.25 RVUs. By comparison, extensive ear canal surgery, CPT Code 69150, is equal to 29.25 RVUs

41.     This compensation model has three components that when totaled determine payment. They are: malpractice RVUs, which reflect the cost of liability for the procedure or service; practice expense RVUs, which estimate the cost of labor and supplies; and, wRVUs, which account for the practitioner's work when performing a procedure or providing a service.

42.     wRVUs factor technical skill, physical and mental effort, medical judgment, stress related to patient risk and the time required to provide the service. They account for 50.9 percent of the total fee calculation. Simply put: The higher the level of service, or CPT code, the greater the wRVU and the larger the reimbursement.

43.     At Sparrow, "wRVU productivity" represents between 85 percent of the pay for primary care and 95 percent for specialty providers. To earn a complete incentive payment, providers must exceed benchmarks based on wRVUs.

44.     Doctors and APPs who don't measure up face pay cuts.

45.     Sparrow makes it clear where individual physicians and APPs stand with its monthly productivity reports. These reports are directed to senior executives, practice leaders and shared with providers. They compare individual practitioners to the practice and their peers across the country.

46.     These reports track the expected and annual gross charges, the expected and actual number of wRVUs, the expected and actual number of visits and the distribution of evaluation and management codes for each doctor and APP.

| MGMA Benchmarks (2020 Physician Compensation & Production Survey) | | | |
|---|---|---|---|
| MGMA Percentiles | wRVU | Visits | wRVU/Visit |
| Median | 3,307 | 3,764 | 1.28 |
| 60th Percentile | 4,173 | 3,084 | 1.30 |
| 75th Percentile | 4,832 | 3,493 | 1.46 |
| 90th Percentile | 6,664 | 3,980 | 1.56 |

At the top right of each review is a small chart showing national benchmarks for their peers in

wRVUs, patient visits and the number of wRVUs per patient visit. It shows the median number of wRVUs, visits and wRVUs by visit as well as 60th, 75th and 90th percentile nationally.

47.       Providers and their bosses can easily compare performance. Just below the "benchmarks" is a section titled, the "Productivity Calculation." The monthly report details the revenue, the wRVUs, the visits and the wRVUs per visit. The totals appear just under the national benchmark.

| Productivity Calculation | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Visits** | | | | | | | | | | | | | |
| FY20 Visits Actual | 438 | 308 | 273 | 38 | 90 | 139 | 476 | 99 | 126 | - | - | - | 1,695 |
| FY19 Visits | - | 2 | - | - | 18 | 80 | 25 | 409 | 322 | - | - | - | 356 |
| Difference Actual vs. Prior Year Visits | 438 | 306 | 273 | 38 | 80 | 59 | 451 | (10) | (196) | - | - | - | 1,339 |
| **wRVU per Visit** | | | | | | | | | | | | | |
| FY20 wRVUs/Visit Actual | 1.47 | 1.47 | 1.48 | 0.94 | 0.62 | 0.44 | 1.27 | 1.36 | 1.47 | - | - | - | 1.22 |
| FY19 wRVUs/Visit | | 1.30 | | | 1.52 | 1.25 | 1.16 | 1.14 | 1.16 | | | | 1.18 |
| Difference Actual vs. Prior Year wRVUs/Visit | | 0.17 | | | (0.90) | (0.81) | 0.10 | 0.22 | 0.31 | | | | 0.04 |

48.       The bottom of the report provides a visual representation of each category. A separate section shows coding distributions for each provider. They compare the performance of individual doctors and APPs against the experience of the practice and CMS practitioners nationwide.

49.       For example, the September 2020 report for Rachel Chapko, a physician assistant in the surgical specialty care unit – orthopedic, includes charts showing the coding distribution for her established and new patients. Here is the review for E&M codes 99211 through 99215:



50.       Here is the review of Ms. Chapko's coding distribution for E&M codes 99201

through 99205:



51.     These reports are created by Sparrow Finance and then distributed each month to supervisors who review and discuss them with their colleagues. They are available to every member of senior management and routinely shared with staff.

52.     Sparrow relies on these productivity measures to evaluate and pay its healthcare practitioners. For much of its staff, the healthcare giant finalizes compensation with a "productivity reconciliation." This example was generated for the COVID crisis. A similar reconciliation is regularly conducted for those on the provider-based compensation model.

53.     These reconciliations link compensation for APPs and physicians to patient visits and CPT codes and ultimately, wRVUs. Sparrow has four physician compensation models: salary, productivity-based, shift-based and base plus. APP are paid based on salary, productivity or shifts worked. (See Assessment)

54.     To maintain their income, productivity-based providers are required to meet Sparrow-set targets Their performance is reconciled every quarter.

55.     Providers must meet their benchmark to maintain their pay. If they miss the target, they're given a quarter to improve. After that, the health care system can reduce their pay.

56.     Sparrow briefly explained its practices in response to the financial impact it faced

from COVID-19. To limit exposure to the virus, the medical group restricted in-patient visits,

deferred non-urgent primary care and specialty visits and converted in-patient visits to e-visits.

57.     These deferrals had a devastating impact on compensation for high producers.

Effective March 25, 2020, Sparrow suspended its compensation policies:

> "In order to maintain the base compensation of its providers during this time of
> national crisis and to keep base salaries as is, there will be no productivity
> reconciliation for the first two quarters of 2020. ... This policy does not apply to
> performance/quality incentives which will be addressed after the expiration of this
> temporary policy."

58.     It added that practitioners with "excess capacity" will be required to enter the

provider pool for that excess and may be assigned to other areas in the health system during the

crisis.

59.     Prior to COVID-19, the productivity targets required doctors and APPs to increase

the number of visits or the average wRVUs attributed to each patient to maintain their paycheck.

Sparrow tracks both.

60.     The emphasis on E&M billing levels came as the healthcare system weakened its

review of how physicians and APPs categorized their work to Medicare.

61.     In December 2016, its booklet "Code of Conduct and Compliance Program, Focus

on Integrity and Ethics" classified eight areas as "High Risk Compliance Areas," including

physician supervision, coding and billing. It explained:"Based on a risk analysis process, the

appropriate Compliance Committees will annually endorse the most significant risks that require

focused compliance effort at the Department and Affiliate level."

62.     The risk in coding, the 28-page booklet explained, was "ensuring accurate

coding on claims representing Sparrow's inpatient, outpatient and Physician services." Physician

supervision also was a concern:  Ensuring appropriate supervision and related documentation of

APPs, residents and outpatient services. Billing was another high-risk area with compliance efforts focusing on "ensuring accurate units, modifiers, and place of service on claims, with appropriate follow-up and improvement on significant denial areas."

63.    It cited 27 potential trouble spots including the revenue cycle area which manages and collects patient revenue, the medical group and the Thoracic and Cardiovascular Institute – an outpatient unit that dramatically increased its use of high-level codes just two years later.

64.    By 2018, Sparrow no long listed coding as a critical risk area.

65.    That year's code of conduct booklet simply stated compliance programs and policies on "appropriately documenting, coding and billing for services" had been developed. The program consisted of monitoring and auditing to prevent or detect errors in documentation, coding or billing. Neither coding nor billing were listed high risk. The code monitoring program dramatically changed.

66.    In early November 2019, Relator Crowe complained to senior executives at Sparrow that her review of patient charts raised concerns. Her email to Kruger, the vice president of administration at Sparrow Medical Group, concluded "we have a situation that is a quality and safety concern as well as a reimbursement concern, and could likely be a significant problem at some point in the future if not corrected."

67.    An accompanying spreadsheet detailed coding issues on 13 charts. Crowe reduced the level of service on six patient encounters and raised questions about the services performed and documentation on seven others performed by Shelly Vliet, a nurse practitioner. Crowe provided her analysis to Vliet who responded:

"I really appreciate you reviewing them. To be honest, I have never had feedback and I think it's great. As far as that goes, I have never had a formal billing course and up to this point have been winging it. On a side note, I'm not sure if Sparrow is going to be managing the HGB UC[Sparrow Eaton Urgent Care], but I can tell you there is NO emphasis on billing appropriately. With that being my first position out of school, I learned as I went and was never aware of the multiple mistakes I'm sure I was making. I spoke with a Sparrow biller once and found as a clinic we were severely under-billing."

68.       Kruger thanked Crowe for making senior leaders aware of the issue, adding quality, safety and coding concerns had to be considered as the medical group examined how to position the urgent care center, and.Sparrow has yet to take action,

69.       Three months later, in February 2020, Crowe raised her concerns over coding with Gloria Cook, the Sparrow Professional Billing Supervisor in the business and education Center. She explained her chart reviews consistently showed doctors and APPs coding at a higher level of service than justified.

70.       Her conclusion rested on an analysis from the healthcare system's electronic record keeping system, EPIC, followed by a detailed manual review of patient charts. EPIC's "SmartCode Analyzer" examines the documentation in the electronic medical record, calculates the level of service and recommends a CPT code. At Sparrow, the analyzer does not automatically review every encounter. It runs only when asked.

71.       Three components determine what code should be billed: medical history, physical examination and medical decision making. Medical decision making refers to the complexity of establishing a diagnosis and/or selecting a management option. It includes the risk of significant

complications, morbidity or mortality as well as comorbidities associated with the patient's medical issue.

72.      Medical decision making, in turn, drives medical necessity. The medical necessity of a service is the "over-arching criterion for payment." CMS emphasized the role of medical decision making when it updated its regulations effective Januaruy 2021. Under the new rules history and physical exam elements are recorded but do not factor into the determination of the level of service. According to Cook, Sparrow practitioners are supposed to start with medical decision making and then determine what's needed.

> "… overall I do not think it is being done that way (starting with MDM).It appears if the History and Exam qualify for the higher LOS, [Level of Service] regardless of the MDM, often the higher LOS is what is entered," Crowe wrote in a February 4, 2020 email to Cook adding it was difficult for her to determine the extent of the higher coding."

73.      Cook offered little insight. Sparrow's billing office no longer reviews office visits for coding on a daily basis, she wrote. The plan, she explained, is to catch any discrepancies on the annual chart review, adding that a recently hired coder would be doing chart audits.

74.      The CPT codes found in EPIC are "dropped" and billed to Medicare by Sparrow.

75.      Cook suggested providers evaluated by Dr. Crowe take a refresher course at E/M University, which teaches practitioners at Sparrow about coding.

76.      Dr. Crowe compared the service codes assigned by doctors and mid-level providers to those calculated by the "SmartCode Analyzer" embedded in EPIC, the electronic health record system used by Sparrow.

77.      Her review found more than 100 cases in Sparrow's urgent care unit where the

coding assigned by medical staff didn't match the conclusion reached by the analyzer software. Her manual chart review found an overwhelming majority were upcoded.

78.    In some cases, the medical chart, which is supposed to provide the documentation needed to support the CPT codes used for billing, didn't contain enough information for the software program to analyze the visit and make a recommendation.

79.    The software system runs, and makes coding recommendations, only when asked. It reviews the physical examination, determines the number of body systems and health elements reviewed and, based on an algorithm, assigns a CPT Code. Its calculation doesn't always fully take into account medical notes.

80.    EPIC is not programmed to auto populate the electronic health record. At Sparrow, the charges recorded in EPIC provide the basis for billing Medicare. The system's billing supervisor said these charges are rarely changed.

81.    For example, Crowe's review found:
An 81-year-old Medicare patient suffering from chronic kidney disease met with a nurse practitioner on January 7, 2020 for a follow-up to his laboratory tests. Epic's "SmartCode Analyzer" concluded the office visit should be billed using CPT code 99212, the second lowest level of care for an established patient examined in the office.

82.    The software analysis warned: "The following must be medically necessary, properly performed and appropriately documented to meet the requirements of the next level of service.'

83.  `The "next level," CPT 99213, required between 6 and 11 elements. The nurse practitioner documented just one system and one element.

84.    Sparrow categorized the visit using CPT 99215 – the code for the highest level of

17

care – two steps above the billing level recommended by the hospital's software.

85.      Medicare paid $46.19 for professional services billed under CPT 99212 in 2020.
Taxpayers spend three times more for in-office medical visits categorized as CPT 99215. At
$148.23, the higher code adds $102.

86.      An 86-year-old Medicare patient met with a doctor on January 10, 2020 for a
follow-up blood pressure check and a Prolia injection. The analyzer concluded the woman's
office visit should be billed using CPT code 99213.

87.      The software added the next level of exam documentation requires 12 or more
elements from two or more systems areas. The practitioner marked the visit at the next level of
service, 99214, the second highest category.

88.      In 2020, Medicare paid $76.15 for professional services under CPT Code 99213.
It paid 30 percent more for services billed under CPT Code 99214, which pays $110.43.

89.      A 65-year-old woman was examined by a physician on January 10, 2020 after an
abnormal cardiovascular stress test. The analyzer's review found the Medicare patient's office
visit should have been billed using CPT 99202, the second lowest evaluation category

90.      Three additional elements were needed to qualify for the next level of service, the
software analyzer said. Sparrow listed the level of service as CPT 99204.

91.      Medicare reimbursed the professional component of services provided under CPT
code 99202 at $77.23 in 2020.  It paid $167.09 for services provided under CPT code 99204,
doubling the cost by adding almost $90 to the bill.

92.      A 68-year-old Medicare patient was examined by a nurse practitioner for a six

month recheck on January 10, 2020. The analyzer determined the visit should be billed under

CPT Code 99213. It said to bill at the next level would require a more detailed patient history,

adding at least three elements. Still, Sparrow recorded the service under CPT Code 99214

93.        Medicare paid $76.15 for services provided under CPT Code 99213. It paid

$110.43 for services billed under CPT Code 9914, about 30 percent more.

94.        In some cases, the EPIC analyzer could not find enough documentation to

recommend a code.  Dr. Crowe reviewed these charts in detail to determine whether the visit was

correctly billed. This is her summary of the reviews.

95.        Her analysis provided 28 examples of upcoding – all involve evaluation and

management billing codes – from 14 physicians and APPs. The average difference between what

should have been billed and what was billed is $30.67.

96.        From 2015-2018, these practitioners were paid $1.5 million for work attributed to

codes 9902-99205 and 99211-99215. Their use of code 99214 stands out.

97.        From 2015 through 2018, the practitioners in the sample provided by Crowe used

code 99214, on average, more than twice as much as their colleagues in Michigan, according to

Medicare payment data maintained by CMS.

98.   At the same time, they used codes that pay less and reflect less severe medical conditions

as much as 88 percent less. The examples provided by Crowe show that treatments billed as

Code 99214 should have been submitted to Medicare as Code 99213 which pays $21.83 less.

**[SPACE INTENTIONALLY LEFT BLANK]**

**This is a breakdown by code:**

| Code | # Services provided by the upcoding group | Average # services per provider | # Services provided by all Michigan providers | Average # services per Michigan provider | Comparison upcode group to all MI docs |
|---|---|---|---|---|---|
| 99211 | 35 | 35 | 384,931 | 308 | (88.6%) |
| 99212 | 592 | 148 | 1,440,772 | 216 | (31.5%) |
| 99213 | 6,548 | 504 | 11,638,081 | 587 | (14.1%) |
| 99214 | 15,285 | 1,390 | 12,084,001 | 647 | 115% |
| 99215 | 448 | 112 | 1,289,909 | 193 | (14.9%) |

99.     The practice appears widespread based on payment data reviewed for more than 360 physicians and advanced practice providers listed on the Sparrow Health System website.

100.     These Sparrow physicians and APPs billed some codes 50 percent or more, on average, than their colleagues in Michigan, show data maintained by CMS for calendar years 2015 through 2018.

101.     Again, the use of code 99214 stands out as does code 99213.



The decision of which code to use hinges on the medical complexity and medical necessity of the case. CPT code 99214 is the second highest paying of the evaluating and management levels of service used in office visits. It is, according to websites aimed at medical coders, one of the most used and abused codes in the country.

102.    Taxpayers pay $21.83 more for services when code 99214 replaces the next lowest

level of service, code 99213. Code 99214 costs $39.15 more than code 99212, which is meant for less complex medical cases.

**[SPACE INTENTIONALLY LEFT BLANK]**

**This is a breakdown:**

| Code | # Services provided by Sparrow | Average # services per provider | # Services by all Michigan providers | Average # services per Michigan provider | Comparison Sparrow to all MI docs |
|------|------|------|------|------|------|
| 99211 | 968 | 46 | 384,931 | 308 | (85.0%) |
| 99212 | 28,718 | 251 | 1,440,772 | 216 | 17.4% |
| 99213 | 213,341 | 716 | 11,638,081 | 587 | 22.0% |
| 99214 | 231,185 | 893 | 12,084,001 | 647 | 38.0% |
| 99215 | 16,352 | 146 | 1,289,909 | 193 | (24.5%) |

103.    A comparison of the use of evaluation and management CPT codes for new patients provides similar results for the 360 providers listed on the Sparrow website.

104.    Note how infrequently they use the least expensive evaluation code – about 40 percent less than their peers form 2015 through 2018. The difference in cost to taxpayers between Code 99201 and 99204, on average, is $81.14 per visit in 2020.



These patterns hold true for the 14 practitioners identified by Dr. Crowe. This group used one code, CPT 99204, twice as often as their peers in Michigan from 2015 through 2018.

105.    From at least 2015 through 2020, Sparrow measured the productivity of many of its

physicians and APPs with a series of metrics that included a comparison of their coding experience with the Sparrow Medical Group practice and CMS. These coding comparisons are provided to senior managers who distribute them to individual practitioners.

106.     The code tracking system compares the expected billing distribution of each E&M code. It measures the percentage each code makes up of the total billed. The commercial insurer Blue Cross Blue Shield of Michigan (BCBS) analyzes these claims in a similar fashion as part of its ongoing claims review.

107.     For example, if 100 claims were filed for evaluation and management of an established patient – CPT codes 99211-99215 -- the expected distribution for 50 claims filed as CPT Code 99214 would be 50 percent.

108.     In a November 2020 report, BCBS concluded the percentage of high-level codes billed by Dr. Crowe was greater than expected for CPT Code 99214. Crowe supervises APPs, but no longer personally treats patients. The billings on the BCBS report most likely represent charges billed to BCBS by mid-level providers who report to Dr. Crowe and raised concerns about inappropriate use of "Incident to."

109.     BCBS sends these evaluations to individual doctors on a monthly basis. It is unclear whether the insurer's analysis also is made available to Sparrow.


**[SPACE INTENTIONALLY LEFT BLANK]**



In December, BCBS reported the percentage of high-level codes billed by Crowe's office had declined, but still was greater than expected for code 99214.

110.     BCSC reports on two other doctors showed their use of code 99214 is nearly double the expected use. The December E/M report of Dr. Theresa A. Kordish, DO, a family practice doctor working in Sparrow Urgent Care, is at left.

111.     All three reports – two from December and one from November -- focus on family medicine practices and reflect substantially less use of a lesser CPT code, 99213, than their peers.

112.     The analysis from BCBS compares billing distribution percentage for each doctor against the billing for E&M claims of physicians in the same specialty across the country. An analysis of claims data maintained by CMS for Michigan doctors and APPs produced similar results, though the differences aren't as dramatic.

113.     The BCBS analysis shows family practitioners using Code 99214 twice as often as their colleagues. 99214 is the second highest level of service. Sparrow's providers used the next lowest code, 99213, about 75 percent less than their peers.

114.     In 2020, Medicare paid $110.43 under code 99214. It paid almost a third less – $76.15 -- for claims made using code 99213.

24

115.    A comparison of Sparrow family practice providers with their peers in Michigan using the same criteria employed by BCBS found a similar but smaller disparity, the CMS Medicare data show.

116.    The CMS data showed Sparrow doctors and APPs used the higher level of service and more expensive CPT Code 99214 some 21.5 percent more than expected. They used the less expensive code, 99213, 21 percent less often than expected.



**Family Practice: Comparison of Billing Codes 99211-99215 Use By Sparrow, Michigan Providers**

117.    This comparison of Family Practice doctors relies of claims data maintained by CMS for Michigan doctors and APPs for calendar years 2015 through 2018. It includes only the practitioners tracked in the monthly productivity reports generated by Sparrow.

118.    Doctors and APPs tracked in Sparrow's annual productivity reports change from year to year, as practitioners joined or left the healthcare system. The analysis reflects their billing experience only during the time they were employed by Sparrow. Their employment dates were determined from an analysis of state medical licenses, the health system's public postings and CMS reports.

119.    The disparities aren't limited to family medicine. The internal medicine, interventional cardiology, otolaryngology and psychiatry units all show similar patterns with greater than expected use – sometimes double – of code 99214 and less than expected use – sometimes less than half – of code 99213.

120.    Overall, doctors and APPs tracked on Sparrow's productivity reports use the more

25

expensive and higher level of service code, 99214, 30 percent more than their peers in Michigan. The lower level of service, 99213, is used 26 percent less than expected by Sparrow doctors and APPs when compared to their colleagues across the state.

121.    Dr. Crowe is not the only one to question whether the coding levels at Sparrow were used correctly.

122.    On January 8, 2021, a patient who identified herself as a doctor complained that her visit in November had been incorrectly coded. A grievance filed with the Patient Experience Department (PED) said:

> "Pt contacted PED again on 1/4/21 and again said she was calling in regard to her bill being coded incorrectly. Pt states she is a Dr so she knows what a CPT code is. The pt also said that she previously spoke to someone and that the coding had been updated from a Level 4 to a 3, but that was still coded incorrectly and that could be considered fraud."

123.    A review of the complainant's medical chart by Dr. Crowe raised questions about another billing issue – violation of the "Incident to" guidelines put in place by CMS. "Incident to" billing allows a non-physician to bill in the doctor's name, a practice that increase reimbursement by 15 percent.

**Incident-To Billing**

124.    Medicare beneficiaries are increasingly reliant on advanced practice providers and physician assistants for their care, particularly as the states have expanded laws enabling APPs to practice with more authority and autonomy.

125.    Over the last decade, the number of nurse practitioners and physician assistants have doubled with an increasing number practicing in specialty fields. Despite their growing role, Medicare often doesn't know when these services are provided by an APP or a doctor

26

because of what a congressional commission calls an "artifact of Medicare law called incident to."

126.     The incident to rules allow APPs to bill for services they provide under the supervising physician's name, a practice that increases the payment from taxpayers by 15 percent.  For Medicare, a service provided by an APP and billed "Incident to" under a supervising physician's name is indistinguishable from a claim for services provided directly by the doctor.

127.     Services provided and billed directly by a nurse practitioner or a physician assistant pay at 85 percent of the Medicare physician fee schedule. The same procedure billed in the name of a supervising doctor pays at 100 percent.

128.     MedPac, a commission that advises Congress on Medicare issues, estimates that more than 40 percent of all evaluation and management (E&M) office visits for established patients were performed by nurse practitioners, but billed to physicians as "Incident to" in 2016. Its analysis concluded 30 percent of these E&M visits in physician offices were handled by physician assistants who billed the service under the doctor's name.

129.     In 2019, the commission recommended "Incident to" billing be eliminated as it would save money without affecting care. Specialized websites catering to coders say although the rules are clearly defined, the incident to guidelines are continually abused and the services are billed incorrectly. CMS provides the incident to guidelines in Publication 100-2, Chapter 15, Section 60.

> To be covered, "... there must have been a direct, personal, professional service furnished by the physician to initiate the course of treatment of which the service being performed by the non-physician practitioner is an incidental part, and there

27

must be subsequent services by the physician of a frequency that reflects the

physician's continuing active participation in and management of the course of

treatment."

130.     WPS Government Health Administrators, the MAC responsible for Michigan,

provides specific examples:

"Dr. A is currently treating the patient for diabetes. The patient's evaluation and

management (E/M) encounter is with a Physician Assistant (PA) of the same

group. The chief complaint is an upper respiratory infection. Can the PA bill the

service incident to Dr. A's service and bill under Dr. A's provider number?

"The upper respiratory infection is not part of treating the diabetes. Therefore, it is

not an 'integral, although incidental' part of Dr. A's 'professional service.' The PA

submits the correct level of new or established E/.M service under his/her provider

number."

131.     Dr. Crowe, the Medical Director of Sparrow's Urgent Care/FastCare centers,

routinely reviews medical charts. In the course of those reviews, she found medical charts from

across the healthcare system where non-physicians were examining patients for new complaints

and billing under the doctor's name in violation of the "Incident to" rules.

**For example**:

■ On January 28, 2020, Amy Worthing, a physician assistant, conducted an initial

evaluation of a 73-year-old Medicare patient complaining about pain in his right knee.

Worthing's notes identify him as a new patient and the examination as "an initial

evaluation of his right knee." Two months later, Worthing conducted a follow-up exam.

Both services were billed as "Incident to," according to the chart. The chart does not show a doctor caring for, examining or developing a treatment plan for the patient.

132.    An initial history and physical performed by a non-physician practitioner, although the doctor is documented as being present or in the office suite, is not covered according to the incident to guidelines. The physician must perform the initial service. The visit should have been billed to Worthing's NPI.

**Additional example:**

o Beginning on Sept 14, 2015, one 88-year-old Medicare patient was examined for five new medical issues by a physician assistant. She wasn't examined by a doctor and no physician participated in, developed a treatment plan or managed the care.

o On September 14, 2015, PA Traci Jones treated her for two new medical issues – a rash and a sinus problem.

o On March 30, 2018 PA Emilia Ivans examined and treated her for non-recurrent pansinusitis.

o On October 12, 2018, Ivans examined and treated her for diverticulitis.

o On January 24, 2019, PA Kathleen Reinke for acute pain of the right shoulder.

o On May 8, 2019, Nurse Practitioner Megan Hohl examined and treated her for an injury of the left knee.

o On a sixth visit, Mary Jacobs, a nurse practitioner, examined the woman for a previously diagnosed issue. There was no physician on site and no previous urgent care physician established a treatment plan.

133.    Each of these visits should have been billed under the non-physician practitioner's NPI. They were not. Each was billed as "Incident to."

**Additional example:**

    o  In 2019 and 2020, a nurse practitioner and physician assistant independently examined and treated an 89-year-old Medicare patient three times. All three visits were billed as "Incident to."

    o  On August 19, 2019, Nurse Practitioner Lavonna Evans examined and treated the elderly man for a new condition, De Quervain's tenosynovitis, a painful condition affecting the tendons on the thumb side of the wrist.

    o  On January 29, 2020, PA Amy Worthing evaluated the man – identified as a new patient – for pain in his left knee. He has no history of left knee problems and no history of treatment.

    o  On December 17, 2020, PA Worthing evaluated the man's left knee issue in a follow up exam after he complained of pain with no new injury. The pain made it difficult to walk.

134.    Dr. Jarred K. Holt reviewed the notes, the assessment, the order and/or the procedures performed by Worthing. He noted in the chart that he concurred. The chart does not say Holt performed the examination, developed a treatment or managed care on the initial or follow-up visit.

**Additional example:**

    o  From 2014 through 2020, a 69-year-old Medicare patient had 22 visits with Nurse Practitioner Carol Tucker in the diabetic center without a physician ever examining him. Each of the visits was coded as "Incident to" on the patient charts. As a general guideline for quality patient care, supervising physicians should see a patient on every three visits or at least once a year. (Medical review chart)

135.     These electronic records are maintained in EPIC, the electronic record keeping system. EPIC "drops" the charges as coded to a separate electronic billing module which actually makes the claim to Medicare. Dr. Crowe does not have access to these records.

136.     Dr. Crowe's review of medical charts found widespread use of "Incident to" billing across the clinics and offices operated by Sparrow. The charts show new patients or existing patients with new medical issues initially examined by nurse practitioners or physician assistants. Each of these medical services was billed in violation of the "Incident to" guidelines.

<strong>Provider-Based Billing</strong>

137.     Effective April 27, 2020, Sparrow Health System converted 34 freestanding urgent care, specialty and physician offices to on- and off-campus hospital outpatient facilities to collect more money from Medicare and qualify for the 340B discount drug program.

138.     Senior executives estimated the conversion to provider-based billing would generate an additional $2 million from Medicare and another $10 million from the discount drug program. Sparrow said it would replace losses caused by Michigan's new no fault auto law.

139.     Sparrow botched the conversion making it ineligible for both programs.

140.     Nine months after the conversion, executives still are trying to work out compliance problems, but that didn't stop the health care system from billing Medicare or using the discount drug program.

141.     CMS requires each of more than a dozen requirements be met before the newly designated outpatient hospital facilities can charge a separate facility fee and collect fees charged at hospital rates. Sparrow hasn't met all the requirements. And, because Sparrow doesn't meet the provider-based billing requirements, it doesn't qualify for the discount drug program.

142.     The provider-based designation allows 34 Sparrow facilities to bill Medicare and

Medicaid as a hospital outpatient department, which entitles them to a facility fee at hospital reimbursement rates. Patients now receive a bill with charges for professional services from the practitioner and a facility fee from the hospital.  This lists the departments and Medicare Advantage plans affected.

143.     It increases the average reimbursement per office visit by $100 per patient – a $20 patient co-pay – for treatment at on-campus sites and $25 per patient, a $5 patient co-pay for care at off-campus locations.

144.     The increased costs are borne by Medicare, Medicaid and patients through higher co-pays.

145.     The conversion also allows both the on-campus and off-campus operations to participate in the 340B discount drug program.

146.     Kevin Sharpe, the former vice president of revenue cycle, estimated the conversion would generate two new revenue streams with a "Revenue Enhancement Opportunity" of $8 million to $10 million from the discount drug program and another $1.5 million to $2 million in hospital facility payments.

147.     The chief financial officer said the conversion from the physician fee schedule to the Outpatient Prospective Payment System (OPPS) would provide two new revenue sources to replace money lost when Michigan passed a no fault auto law.

148.     In January 2020, Sparrow had a monthly operating loss of $3.5 million. Bill Howe, the Sparrow Hospital Chief Financial Officer said.  Through November 2019, Sparrow lost $20.7 million, according to Howe. He viewed the prospective-billing and discount drug program as a way to increase profits.

149.     The Office of Inspector General considers the provider-based billing program a

32

matter of waste, fraud and abuse. The OIG twice has recommended the special billing

designation be eliminated.

150.      In 2016, an OIG report concluded CMS has no independent way to determine

whether provider-based facilities are overcharging and has difficulty obtaining the

documentation needed to determine whether the hospitals are following the rules. The OIG

found:

- ■ CMS doesn't determine whether all hospitals using the provider-based billing system

  meet the program's requirements.

- ■ CMS only determines whether hospitals meet the program's requirements when they

  file an attestation. Attestations are voluntary. The program essentially operates on the

  honor system.

- ■ Two thirds of the hospitals with provider-based facilities had not attested for at least

  one of these provider-based facilities.

- ■ 39 of 50 hospitals in an OIG sample had not voluntarily attested that they complied

  with the regulations. At least one of the on-campus or off-campus facilities at each of

  those 39 hospitals did not meet one or more provider-based requirements.

- ■ CMS cannot identify all on- and off-campus provider-based billing from its claims

  data.

151.      CMS treats these on-campus and off-campus "outpatient" locations as part of the

hospital when the hospital maintains control over the quality of care and finances at each

location, treats these outpatient facilities like every other hospital department and meets

numerous requirements delineated in 42§413.65. The requirements include notifications to

patients.

33

152.     The provider-based designation allows facility payments at hospital rates and qualifies the 34 urgent care, physician offices, clinics and other on-campus and off-campus locations for the 340B discount drug program.

153.     On August 13, 2020,  Dr. Crowe asked Howe, the chief financial officer for the Edward W. Sparrow Hospital, when the system would be in compliance with CMS provider-based billing requirements. Paula M. Reichle, senior vice president and chief financial officer at Sparrow Health System, responded the next day.

154.     The next day, in an August 14, 2020 email to Crowe, Reichle wrote:

> "I fully agree that the implementation and communication process was not as smooth or coordinated as I would have liked. We are working hard to bring this to a successful conclusion."

155.     A month later, on September 15, 2020, Patrick Sustrich, the director of consumer outreach at Sparrow, asked the health system's director of finance who was in charge of compliance for the program. The email to Tonya Harrison said, in part:

> "Who is in charge of compliance associated with PBB? Two months or so ago, we had Matt joining our SMG Director calls and he was providing insight on PBB compliance. We have not heard anything in quite some time and are unaware of signage, patient notification, etc. is in place of UC (urgent care)."

156.     An hour later, Harrison forwarded an email from the PBB compliance officer, Matt Nobis. Nobis acknowledged the hospital was still working on compliance related items with its consultant, Plante Moran.

157.     Some six months after the April 27, 2020 launch, on October 4, 2020, hospital officials met to discuss how to bring the program into compliance.

158.     Among the critical requirements are: notification to patients of the additional charges they will face and clinical and financial integration between the medical staff at the off-campus locations and the hospital.

159.     Sparrow doesn't provide patients, before the delivery of services, written notice of the amount of financial liability – that the beneficiary will incur a coinsurance liability for an outpatient visit to the hospital as well as for the physician service, Crowe said.

160.     Neither the signs nor a patient letter tells patients they will pay or the amount of the co-insurance payment for the hospital facility charge as required under CMS 5g.  The regulation adds:

> "If the exact type and extent of care needed is not known, the hospital furnishes a written notice to the patient that explains that the beneficiary will incur a coinsurance liability to the hospital that he or she would not incur if the facility were not provider-based."

161.     The estimate must be provided before the delivery of services.

162.     On December 16, 2020, Sparrow launched a Patient Cost Estimator Portal as part of a government requirement for pricing transparency. Sparrow says the tool provides clear, accessible pricing information online. Sparrow may argue this online tool provides an estimate before services are offered.

163.     The tool, however, is difficult to use. It requires a patient to enter a CPT code to view pricing information. It would be difficult for most patients to identify the proper CPT code before a service is provided. There is no obvious mention of a facility charge which would increase co-payments. Patients also may not know it exists.

164.     Based on the meetings attended by Dr. Crowe and documents, these specific

requirements haven't been met:

- o Requirement 2c: The chief medical officer of the main hospital and medical director of the newly minted outpatient facilities must maintain a reporting relationship that has the same frequency, intensity and level accountability that exists between the chief medical officer and medical director of a department of the main provider;

- o The majority of the ambulatory care sites don't have this relationship;

- o Requirement 2d: Sparrow has no arrangement where medical staff committees or other professional committees at the hospital are responsible for the medical activities in the off-campus facilities;

- o 5a: Sparrow hasn't provided training for the satellite facilities about the anti-dumping rules.

165.     Plante Moran, a consultant hired by Sparrow to help implement the billing program, provided the hospital references the CMS regulations. Both the Plante Moran summary and the regulations published by CMS track 42 CFR 431.65

**DAMAGES**

166.     From 2015 through 2018, revenue at Sparrow from codes 99201 through 99205 and 99211 through 99215 totaled $34.5 million, based on CMS claims data.  The estimated fraud is $7.9 million. The fraud calculation uses this methodology:

- Calculate the Average Medicare Payment per CPT code by year in Michigan;

- Calculate the number of services provided by CPT code by year for Sparrow;

- Calculate the difference between the experience for Sparrow and Michigan providers;

- Multiply the experience difference for Sparrow by the Medicare payment for the next lowest level of service;

- For example, the experience difference for Code 99214 would be multiplied by the Medicare payment for Code 99213 in the corresponding year; and,

- Damages for 2019 and 2020 are estimated based on the 2018 fraud plus the median increase of 66.9 percent from 2015-2018.

| CPT Code | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|
| 99201 | $ (37) | $ (1,007) | $(972) | $(935) | $(2,951) |
| 99202 should have been 99201 | $7,732 | $2,476 | $72,191 | $104,133 | $345,398 |
| 99203 should have been 99202 | $80,445 | $88,628 | $72,191 | $104,133 | $345,398 |
| 99204 should have been 99203 | $114,273 | $81,417 | $118,908 | $109,136 | $423,735 |
| 99205 should have been 99204 | $ 28,646 | $46,018 | $28,012 | $24,207 | $ 126,883 |

| CPT Code | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|
| 99211 | $(3,158) | $(2,551) | $(2,623) | $(1,384) | $ (9,715) |
| 99212 should have been 99211 | $7,116 | $ 8,491 | $3,548 | $5,765 | $24,920 |
| 99213 should have been 99212 | $(8,603) | $57,607 | $43,963 | $111,070 | $204,037 |
| 99214 should have been 99213 | $137,382 | $277,295 | $610,596 | $1,004,342 | $2,029,615 |
| 99215 should have been 99214 | $(113,380) | $(101,103) | $(105,748) | $(96,052) | $(416,283) |

**Totals**

| | |
|---|---|
| Total 99201-99205 | $1,238,463 |
| Total 99211-99215 | $1,832,573 |
| Total All 2015-2018 | $3,071,036 |
| Estimated 2019 @ Average Growth Rate 66.9% | $2,277,772 |
| Estimated 2020 | $ 2,589,826 |
| Estimated damages 2015-2020 | $ 7,938,634 |

167.     These damage calculations only take into account the payments to providers in the Medicare fee for service program. The calculations don't include Medicare Advantage or other managed care programs.

168.     Additionally, on information and belief, the damages attributable to the "incident-

37

to" allegations are approximately at least $11,000,000. That estimate is based on the fact that at the time of the filing, Relator had acquired screenshots of over 1,000 violations where the incident-to regulations were not followed in the care of Medicare patients.

## COUNT I

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31  U.S.C. §§ 3729 et seq.

169.      Relator incorporates paragraphs 1 through 168 of this Complaint as through fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

170.      As described in greater detail above, Defendants caused false claims to be submitted to the United States.

171.      Under the FCA, Defendants have violated:

    i.   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

    ii.  31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

    iii. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

172.    Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a.  This Court enter an order determining that Defendants violated the FCA and State FCAs by making  false statements and records to cause false claims to be submitted to the United States and the Plaintiff States;

b.  This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c.  This Court enter an order requiring Defendants to cease and desist from violating the FCA and State FCAs;

d.  This Court enter an order requiring Defendants to pay all expenses, attorney's fees and costs associated with this action;

e.  This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f.  Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated: September 1, 2021

/s/ David Haron
David Haron
DHaron@HoyerLawGroup.com
MI Bar No: P14655
Hoyer Law Group
30300 Northwestern Hwy
Ste. 115
Farmington Hills, MI 48334

Tel: 248-762-7009